PIERRE STROESSER AND OTHERS v. BOBBY JOE
HOPPER AND OTHERS.
MARK DOYNE'S, INC., APPELLANT.

129 N. W. (2d) 913.

August 7, 1964—No. 39,194.

*Ryan, Kain, Mangan, Westphal & Kressel*, for appellant.

*Baudler & Baudler* and *Peterson & Peterson*, for respondents Reagan.

*Plunkett & Plunkett*, for respondent Stroesser.

*Wallace C. Sieh*, for respondent Hopper.

OTIS, JUSTICE.

This litigation arises out of a collision between automobiles operated by plaintiff Bernard Reagan and defendant Bobby Joe Hopper in which the drivers and their passengers seek to recover damages for personal injuries. The jury by special verdict found defendant Hopper liable to his passenger, plaintiff Pierre Stroesser, and to Reagan and his passengers. In addition it determined that defendant Mark Doyne's, Inc. (hereinafter designated "Doyne") was the owner of the automobile being driven by defendant Hopper at the time of the accident. The court entered findings of fact and conclusions of law consistent with the jury's verdict. Defendant Doyne appeals from an order denying its alternative motion to vacate the verdict, amend the findings, and enter judgment n. o. v., or grant it a new trial. Hopper has not appealed.

■ Doyne assigns as error the court's failure to hold as a matter of law that Doyne was not the owner of the vehicle which Hopper was driving. The circumstances under which Hopper secured possession of the automobile are not in serious dispute.

On June 7, 1961, at about 1:30 in the afternoon, Hopper appeared at Doyne's automobile agency in an MG sports car and briefly discussed the possibility of trading it in on an Austin-Healey automobile. Hopper agreed to a price, and the salesman suggested he take the Austin-Healey back to his place of business while he determined whether his bank would finance the transaction. Hopper followed this suggestion and returned to Doyne at about 4 o'clock the same afternoon to advise them he had secured informal approval of the loan. However, Hopper made it clear that he would not be available to complete the financing until the following Monday, June 12. He testified he advised Doyne that the transaction would not be consummated unless he secured the necessary financing from his bank. At the suggestion of Doyne, Hopper decided to leave his MG and take the Austin-Healey overnight with a view to returning it in the morning. Thereupon Doyne secured Hopper's execution of a purchase order, an invoice, a conditional sales contract, a bill of sale, and an application for transfer of the registration certificates acknowledged under oath, designed to permit the ultimate transfer of the Austin-Healey to Hopper and the MG to Doyne. The contract was designated a "cash on delivery" sale for the total sum of $2,452, of which $1,000 was credited on the trade-in of the MG and the balance payable in cash. As further security Doyne insisted on Hopper's signing a check for $1,452, notwithstanding the fact Hopper made it plain the check would not be covered by sufficient funds unless the bank completed the financing the following week.

The accident in question occurred at about 11:50 the same evening, resulting in extensive damage to the Austin-Healey. Hopper failed to pursue the negotiations for a loan on the theory it would be futile to do so in view of the fact the security had for practical purposes been demolished. However, Hopper did apply to and secure from his own collision carrier reimbursement for the damages occurring to the Austin-Healey. Doyne refused to return the MG to Hopper, and on June

20, 1961, Doyne belatedly through the office of the secretary of state transferred the title cards of both the MG and the Austin, and on the same date attempted unsuccessfully to negotiate Hopper's check, payment on which had been stopped. Subsequently Doyne repossessed the Austin by replevin proceedings.

In this state of the record Doyne earnestly contends the jury was not warranted in finding that Doyne had retained title to the Austin at the time of the accident. Respondents, on the other hand, insist that the transaction was expressly contingent on Hopper's securing bank financing, which process had not progressed beyond oral acquiescence. There remained the important matters of fixing the rate of interest, completing the execution of an application and a chattel mortgage, signing the note, securing formal approval of the loan, and the bank's examination of the automobile. In addition, respondents argue that Doyne retained all the papers which normally would be delivered to the purchaser, neglected to sign the purchase order, and delayed transferring the title long beyond the time prescribed by statute.

If Doyne is liable, it is by virtue of the vicarious liability statute, Minn. St. 170.54, under which a driver is deemed to be the agent of the owner for purposes of requiring the owner to respond in damages. Registration of title is prima facie evidence of ownership which may be rebutted by evidence of the true intention of the parties.[1] Under § 169.01, subd. 26, of the Highway Traffic Regulation Act, and § 170.21, subd. 9, of the Safety Responsibility Act, an owner is defined as the person who holds legal title or who is a conditional vendee in possession. The question here presented is governed, however, by the provisions of the Uniform Sales Act, Minn. St. c. 512, pertinent sections of which are as follows:

Section 512.18. "(1) Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.

---

[1]Flaugh v. Egan Chevrolet, Inc. 202 Minn. 615, 279 N. W. 582; Bolton-Swanby Co. v. Owens, 201 Minn. 162, 164, 275 N. W. 855, 857; Phelps v. Benson, 252 Minn. 457, 479, 90 N. W. (2d) 533, 547; Carey v. Broadway Motors, Inc. 253 Minn. 333, 91 N. W. (2d) 753; Haugen v. Dick Thayer Motor Co. 253 Minn. 199, 210, 91 N. W. (2d) 585, 592.

"(2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case."

Section 512.19. "Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer.

"Rule 1. Where there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed."

As we view the evidence, the jury was justified in finding that the parties did not intend title to be transferred until Hopper's financing was completed. It is significant that the entire transaction, including both of Hopper's visits to the Doyne garage, consumed a relatively brief period of time. Hopper was manifestly in a hurry, signed whatever was thrust at him, and acquiesced in any suggestion Doyne proposed, including the offer to take the car overnight. While the purchase order characterized the transaction as a cash sale, Doyne nevertheless retained control and possession of the title papers and obtained as additional security a conditional sales contract and a check which it should have known was not covered by sufficient funds. Under all the circumstances, we are of the opinion that the evidence sustains a finding that the true intention of the parties was not to consummate the contract until the week after possession was temporarily delivered to Hopper, and that the title in the meantime was to remain in Doyne.

■ It is the contention of Doyne that plaintiff Bernard Reagan was guilty of contributory negligence as a matter of law in failing to see the Hopper vehicle before the accident and in failing to yield the right-of-way.

Prior to the collision Reagan was driving south on Railway Street in the city of Austin, approaching Oakland Avenue, a 4-lane divided highway. Reagan testified that he stopped his vehicle in obedience to the arterial highway sign at the north curb of Oakland and looked in both directions. He did not observe any specific vehicles coming from the west but saw headlights about 200 feet west of the intersection of

Highway No. 218, which he estimated was about 300 feet from Railway Street, putting the headlights some 500 feet from where Reagan stood. He stated that he had crossed the north half of Oakland and turned left, heading east, when he was struck on the left center and rear of his vehicle, some 60 or 70 feet east of the intersection.

It is Doyne's version of the accident, however, that Hopper was within about 238 feet of Reagan when Reagan entered the intersection, and that, as Reagan made his left turn, Hopper first attempted to pass him on the right, and finding himself unable to do so, pulled over to pass on the left and thereupon collided with the left side of the Reagan vehicle some 30 feet east of the intersection.

It is the contention of Doyne that under these circumstances it was Reagan's duty to yield the right-of-way under § 169.20, subd. 3, because under the facts Hopper was an immediate hazard as a matter of law. However, the jury was not required to adopt Hopper's version of the time and distance factors, based as they were on computations which limited his speed to 30 miles an hour.[2] In our opinion, the jury was warranted in finding that Hopper had not reached the intersection of Highway No. 218 when Reagan entered Oakland Avenue, and that he bore down on Reagan within the intersection of Railway Street at a rate of speed substantially in excess of 30 miles per hour. The same may be said of Doyne's contention that Reagan's failure to see Hopper brings the case within the rule governing "look-and-not-see-that-which-is-in-plain-sight."[3] Again, we cannot say as a matter of law that the jury was obliged to disregard Reagan's testimony that the nearest vehicle visible to him as he entered the intersection was represented by headlights approximately 500 feet to his right. Since all of Doyne's argument is predicated on the assumption Hopper was driving within the 30-mile-an-hour speed limit, and the physical facts would permit the jury to determine that Hopper was driving at a considerably higher

[2] Pogalz v. Kenna, 267 Minn. 340, 346, 126 N. W. (2d) 458, 463.

[3] Moore v. Kujath, 225 Minn. 107, 29 N. W. (2d) 883; Haugen v. Dick Thayer Motor Co. 253 Minn. 199, 206, 91 N. W. (2d) 585, 590; Kolatz v. Kelly, 244 Minn. 163, 69 N. W. (2d) 649; Boraas v. Carlson, 267 Minn. 478, 482, 127 N. W. (2d) 439, 442.

speed, we decline to speculate on which version is correct and hold that it was a decision for the jury with which the trial court correctly refused to interfere.

■ Doyne assigns as error the court's refusal to find the damages of $4,000 awarded to Genevieve Reagan excessive. The record discloses that Mrs. Reagan first secured medical treatment 2 days after the collision. She complained of a stiffness in the neck, arm, and shoulder on her left side. Her chiropractor applied traction, massage, and heat. This treatment continued about three times a week through the summer until October when she stated the distress of her neck and back was aggravated by a numbness in her left arm and fingers emanating from her shoulder. In October she was examined at the Mayo Clinic, which rendered a report and prescribed medication. She continued to take chiropractic treatments, gradually reducing the number of visits, until June 1962. The total charges for such care were $312. The chiropractor testified that in his opinion Mrs. Reagan had suffered a permanent disability in the left arm and shoulder and that this condition would be manifested intermittently. He neglected to give any percentage of disability or expand on this prognosis. Defendant produced no expert to impeach these conclusions.

While the medical testimony concerning Mrs. Reagan's present condition is sketchy, the prognosis with respect to her arm and shoulder meagerly supported, and the award of $4,000 generous, we are obliged to accept as a fact the uncontradicted testimony that she continues to suffer numbness and pain which may recur. Likewise, the state of the evidence connecting Mrs. Reagan's present condition with the happening of the accident is not altogether satisfactory.[4] Hence, it is with some misgivings that we approve the verdict, having in mind, however, that the trial court is in a better position than we are to assess and evaluate the nature and extent of the damages which Mrs. Reagan suffered.[5]

■ Doyne complains of the court's ruling excluding from evidence

---

[4]Nelson v. The Swedish Hospital, 241 Minn. 551, 564, 64 N. W. (2d) 38, 47.

[5]Romano v. Dibbs, 256 Minn. 332, 335, 98 N. W. (2d) 146, 148; Larson v. Degner, 248 Minn. 59, 67, 78 N. W. (2d) 333, 339.

a notice of loss presented to Hopper's insurance company, prepared at the oral request of Hopper by an unidentified person under the direction of yet a third person. The purpose of the offer was to show that Hopper admitted to his collision carrier that he was the owner of the Austin-Healey at the time of the accident. We have no difficulty in holding that the court was correct in excluding the exhibit. Not only was it clearly hearsay but the facts intended to be proved were readily admitted by Hopper when directly confronted with the question.

In the middle of the trial, Doyne asked leave of the court to assert a claim for indemnity against Hopper. The motion was not granted. Doyne assigns the court's ruling as error. While it is probably true, as Doyne insists, that no additional fact issues would thereby have been introduced, nevertheless the claim for indemnity did assert a new cause of action, and the trial court in its discretion could properly find the motion was untimely.

Affirmed.